PATTERSON *v.* COLORADO *Ex rel.* THE ATTORNEY GENERAL OF THE STATE OF COLORADO.

ERROR TO THE SUPREME COURT OF THE STATE OF COLORADO.

No. 223.   Argued March 5, 6, 1907.—Decided April 15, 1907.

The requirement in the Fourteenth Amendment of due process of law does not take up the special provisions of the state constitution and laws into the Fourteenth Amendment for the purpose of the case, and in that way subject a state decision that they have been complied with to revision by this court.

Whether an information for contempt is properly supported, and what constitutes contempt, as well as the time during which it may be committed, are all matters of local law.

As a general rule the decision of a state court upon a question of law is not an infraction of the due process clause of the Fourteenth Amendment and reviewable by this court on writ of error merely because it is wrong or because earlier decisions are reversed.

While courts, when a case is finished, are subject to the same criticisms as other people, they have power to prevent interference with the course of justice by premature statements, arguments, or intimidation, and the truth is not a defense in a contempt proceeding to an improper publication made during the pending suit.

In punishing a person for contempt of court the judges act impersonally and are not considered as sitting in their own case. *United States* v *Shipp,* 203 U. S. 563, 674.

THE facts are stated in the opinion.

*Mr. Thomas M. Patterson, pro se,* with whom *Mr. Henry M. Teller, Mr. Charles S. Thomas, Mr. Sterling B. Toney, Mr. James H. Blood, Mr. Harvey Riddell, Mr. S. W. Belford* and *Mr. John A. Rush* were on the brief, for plaintiff in error:

The articles and cartoon were legitimate and privileged criticisms. They did not relate to "pending" cases within the meaning of the law; and whatever reference they made to cases were in no wise calculated to interfere with the due administration of justice. These matters are jurisdictional, and by reason of them the court was without jurisdiction to proceed against respondent for contempt and to adjudge a fine against him, and in so doing it was the rendering of a judgment that deprived him of his property without due process of law. *Titus* v. *The People,* 7 Colorado, 451; *New Orleans* v. *Steamship Co.,* 20 Wall. 387.

It follows that in cases of criminal contempt not committed in the presence of the court, there must be a charge, in writing, and stating the facts constituting the contempts, and unless the facts set out constitute a contempt the court is without jurisdiction to either issue a citation or proceed further with the cause. *Cooper* v. *The People,* 13 Colorado, 337; *Mullin* v. *The People,* 15 Colorado, 440; *Wyatt* v. *The People,* 17 Colorado, 252.

Once a suit is decided newspapers may make whatever comments they will about it, and though the honor and integrity of the court may be assailed, judges, like other persons, are relegated to the courts for redress.

To issue a citation in contempt proceedings upon an unverified information confers no jurisdiction, and all proceedings thereafter in such proceedings are void for want of jurisdiction. 4 Blackstone's Commentaries, 286; *Thomas* v. *The People,*

14 Colorado, 254; *Cooper* v. *The People*, 13 Colorado, 355, and cases cited.

The legislature having defined contempts, fixed a practice and declared a punishment, the court was without authority to ignore the statutes and proceed in defiance of their provisions.

The legislature did exercise its authority over contempt and changed the rule of the common law by positive statute. It, like Congress, declared what should constitute contempt, and in doing so it included what has been divided by the courts into civil and criminal contempts in its enumeration. Sec. 321, Colorado Civil Code.

Every one of these enumerated contempts are declared by Rapalje to be criminal contempts, and Rapalje's definition is approved by the Colorado Supreme Court. Rapalje on Contempts, § 21; *Wyatt* v. *The People*, 17 Colorado, 258.

To fine or imprison an accused person in contempt proceedings for publishing the truth about a judge or court when the truth of the charge is pleaded in justification and an offer to prove the same is made, is to deprive him of liberty or property without due process of law. 4 Blackstone's Commentaries, 285; *Cooper* v. *People*, 13 Colorado, 337, 365; *Matter of Sturock*, 97 Am. Dec. 626; *State* v. *Circuit Court*, 38 L. R. A. 559, 560; *In re Shortridge*, 99 California, 526; *Postal Co.* v. *Adams*, 155 U. S. 698; *Windsor* v. *McVeagh*, 93 U. S. 277; *Galpin* v. *Page*, 18 Wall. 350; *Hovey* v. *Elliot*, 167 U. S. 414, 419.

This court has a right to review the decisions of the state courts in contempt cases. *Walker* v. *Sauvinet*, 92 U. S. 90; *Eilenbecher* v. *Plymouth County District Court*, 134 U. S. 31; *Tinsley* v. *Anderson*, 171 U. S. 101; *Manley* v. *Park*, 187 U. S. 547; *Detroit Co.* v. *Osborne*, 189 U. S. 383; *Abbott* v. *National Bank of Commerce*, 175 U. S. 409.

*Mr. I. B. Melville* and *Mr. Horace G. Phelps*, with whom *Mr. William H. Dickson*, Attorney General of the State of

Colorado, *Mr. Samuel H. Thompson, Jr.,* and *Mr. N. C. Miller* were on the brief, for defendant in error:

This court has no jurisdiction to review the judgment of the Supreme Court of Colorado in this case. No treaty or Federal statute of, or any authority exercised under, the United States is involved. No statute of, or authority exercised under, the State of Colorado is involved on the ground of their being repugnant to the Constitution, treaties or laws of the United States.

The legislature of the Territory of Colorado in 1861 adopted the common law of England, so far as applicable and of a general nature, as well as all the acts and statutes of a general nature passed by the British parliament in aid of the common law prior to the fourth year of James I. Laws of Colorado, 1861, p. 35.

A following legislature, in 1868, repealed this statute, but afterwards, at the same session, reënacted it, and it has ever since remained in force in this commonwealth. 2 Mills' Ann. Stat. § 4184; *Herr* v. *Johnson,* 11 Colorado, 393, 396; *Chilcott et al.* v. *Hart,* 23 Colorado, 40, 51; *Teller* v. *Hill,* 18 Colo. App. 509, 512.

The constitution of the State of Colorado was adopted July 1, 1876, and the Supreme Court of such State was created and its duties defined by article VI thereof. 1 Mills' Ann. Stat. 252.

The original thirteen States inherited the common law, and so held it at the time of the adoption of their respective constitutions. Colorado adopted the common law by legislative enactment, and so held it at the time of the adoption of its constitution.

When the courts of those States came into existence by constitutional creation, they became possessed of common law powers by reason of the existence of the common law in their respective jurisdictions; and for the same reason, when the Supreme Court of Colorado came into existence, by virtue of the constitution of such State, it became possessed of common law powers, except as otherwise provided in said instrument.

The Supreme Court of Colorado is a constitutional court, with common law powers, and right of self-preservation is an inherent right in such courts. Rapalje on Contempts, § 1; Abbott's Trial Brief (Crim. 2d ed.), 13; 7 Am. & Eng. Enc. of Law (2d ed.), 30; 9 Cyc. of Law & Proc. 26; 2 Bish. New Crim. Law, § 243; *Ex parte Bollman,* 4 Cr. 75, 94; *United States* v. *Hudson,* 7 Cr. 32, 34; *Anderson* v. *Dunn,* 6 Wheat. 204, 227; *Ex parte Kearney,* 7 Wheat. 39, 42; *Randall* v. *Brigham,* 7 Wall. 523, 540; *Ex parte Robinson,* 19 Wall. 505, 510; *Ex parte Terry,* 128 U. S. 289, 303 *et seq; Ex parte Savin,* 131 U. S. 267, 275; *In re Debs,* 158 U. S. 564, 596.

It follows that the legislature is without power to limit or restrict the exercise of such inherent power, whenever the latter is necessary for the protection and preservation of the efficiency and usefulness of such court. Rapalje on Contempts, § 1; Abbott's Trial Brief (Crim. 2d ed.), note, p. 13; 9 Cyc. Law. & Proc. 27, and cases cited under note 40; 7 Am. & Eng. Enc. of Law (2d ed.), 33, and cases cited under note 1; *Ex parte Robinson,* 19 Wall. 505, 510.

While freedom of the press, like that of freedom of speech, is necessary to the perpetuation of a republican form of government, this does not mean that either can be carried to such an extreme as to impede, embarrass, or unjustly influence the due and orderly administration of justice, or prejudice the rights of litigants in pending cases, for the latter would more surely impair the existence of our government than the former. Cooley's Const. Lim. (7th ed.), 604, 605; 7 Am. & Eng. Enc. of Law (2d ed.), 59; 9 Cyc. Law and Proc. 20; 2 Bish. New Crim. Law, § 259; Abbott's New Trial Brief (Crim. 2d ed.), 15; Oger's Libel & Slander (3d ed.), 519, 524.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a writ of error to review a judgment upon an information for contempt. The contempt alleged was the publication of certain articles and a cartoon, which, it was

charged, reflected upon the motives and conduct of the Supreme Court of Colorado in cases still pending and were intended to embarrass the court in the impartial administration of justice. There was a motion to quash on grounds of local law and the state constitution and also of the Fourteenth Amendment to the Constitution of the United States. This was overruled and thereupon an answer was filed, admitting the publication, denying the contempt, also denying that the cases referred to were still pending, except that the time for motions for rehearing had not elapsed, and averring that the motions for rehearing subsequently were overruled, except that in certain cases the orders were amended so that the democratic officeholders concerned could be sooner turned out of their offices. The answer went on to narrate the transactions commented on, at length, intimating that the conduct of the court was unconstitutional and usurping, and alleging that it was in aid of a scheme, fully explained, to seat various republican candidates, including the governor of the State, in place of democrats who had been elected, and that two of the judges of the court got their seats as a part of the scheme. Finally, the, answer alleged that the respondent published the articles in pursuance of what he regarded as a public duty; repeated the previous objections to the information, averred the truth of the articles, and set up and claimed the right to prove the truth under the Constitution of the United States. Upon this answer the court, on motion, ordered judgment fining the plaintiff in error for contempt.

The foregoing proceedings are set forth in a bill of exceptions, and several errors are alleged. The difficulties with those most pressed is that they raise questions of local law, which are not open to reëxamination here. The requirement in the Fourteenth Amendment of due process of law does not take up the special provisions of the state constitution and laws into the Fourteenth Amendment for the purposes of the case, and in that way subject a state decision that they have been complied with to revision by this court. *French v.*

*Taylor,* 199 U. S. 274, 278; *Rawlins* v. *Georgia,* 201 U. S. 638, 639; *Burt* v. *Smith,* 203 U. S. 129, 135. For this reason, if for no other, the objection that the information was not supported by an affidavit until after it was filed cannot be considered. See further *Ex parte Wall,* 107 U. S. 265. The same is true of the contention that the suits referred to in the article complained of were not pending. Whether a case shall be regarded as pending while it is possible that a petition for rehearing may be filed, or, if in an appellate court, until the remittitur is issued, are questions which the local law can settle as it pleases without interference from the Constitution of the United States. It is admitted that this may be true in some other sense, but it is not true, it is said, for the purpose of fixing the limits of possible contempts. But here again the plaintiff in error confounds the argument as to the common law, or as to what it might be wise and humane to hold, with that concerning the State's constitutional power. If a State should see fit to provide in its constitution that conduct otherwise amounting to a contempt should be punishable as such if occurring at any time while the court affected retained authority to modify its judgment, the Fourteenth Amendment would not forbid. The only question for this court is the power of the State. *Virginia* v. *Rives,* 100 U. S. 313, 318; *Missouri* v. *Dockery,* 191 U. S. 165, 171.

It is argued that the decisions criticised, and in some degree that in the present case, were contrary to well-settled previous adjudications of the same court, and this allegation is regarded as giving some sort of constitutional right to the plaintiff in error. But while it is true that the United States courts do not always hold themselves bound by state decisions in cases arising before them, that principle has but a limited application to cases brought from the state courts here on writs of error. Except in exceptional cases, the grounds on which the Circuit Courts are held authorized to follow an earlier state decision rather than a later one, or to apply the rules of commercial law as understood by this court, rather than those

laid down by the local tribunals, are not grounds of constitutional right, but considerations of justice or expediency. There is no constitutional right to have all general propositions of law once adopted remain unchanged. Even if it be true, as the plaintiff in error says, that the Supreme Court of Colorado departed from earlier and well-established precedents to meet the exigencies of this case, whatever might be thought of the justice or wisdom of such a step, the Constitution of the United States is not infringed. It is unnecessary to lay down an absolute rule beyond the possibility of exception. Exceptions have been held to exist. But in general the decision of a court upon a question of law, however wrong and however contrary to previous decisions, is not an infraction of the Fourteenth Amendment merely because it is wrong or because earlier decisions are reversed.

It is argued that the articles did not constitute a contempt. In view of the answer, which sets out more plainly and in fuller detail what the articles insinuate and suggest, and in view of the position of the plaintiff in error that he was performing a public duty, the argument for a favorable interpretation of the printed words loses some of its force. However, it is enough for us to say that they are far from showing that innocent conduct has been laid hold of as an arbitrary pretense for an arbitrary punishment. Supposing that such a case would give the plaintiff in error a standing here, anything short of that is for the state court to decide. What constitutes contempt, as well as the time during which it may be committed, is a matter of local law.

The defense upon which the plaintiff in error most relies is raised by the allegation that the articles complained of are true and the claim of the right to prove the truth. He claimed this right under the constitutions both of the State and of the United States, but the latter ground alone comes into consideration here, for reasons already stated.. *Ex parte Kemmler,* 136 U. S. 436. We do not pause to consider whether the claim was sufficient in point of form, although it is easier to refer to

the Constitution generally for the supposed right than to point to the clause from which it springs. We leave undecided the question whether there is to be found in the Fourteenth Amendment a prohibition similar to that in the First. But even if we were to assume that freedom of speech and freedom of the press were protected from abridgment on the part not only of the United States but also of the States, still we should be far from the conclusion that the plaintiff in error would have us reach. In the first place, the main purpose of such constitutional provisions is "to prevent all such *previous restraints* upon publications as had been practiced by other governments," and they do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare. *Commonwealth* v. *Blanding*, 3 Pick. 304, 313, 314; *Respubica* v. *Oswald*, 1 Dallas, 319, 325. The preliminary freedom extends as well to the false as to the true; the subsequent punishment may extend as well to the true as to the false. This was the law of criminal libel apart from statute in most cases, if not in all. *Commonwealth* v. *Blanding, ubi sup.;* 4 Bl. Com. 150.

In the next place, the rule applied to criminal libels applies yet more clearly to contempts. A publication likely to reach the eyes of a jury, declaring a witness in a pending cause a perjurer, would be none the less a contempt that it was true. It would tend to obstruct the administration of justice, because even a correct conclusion is not to be reached or helped in that way, if our system of trials is to be maintained. The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.

What is true with reference to a jury is true also with reference to a court. Cases like the present are more likely to arise, no doubt, when there is a jury and the publication may affect their judgment. Judges generally, perhaps, are less apprehensive that publications impugning their own

reasoning or motives will interfere with their administration of the law. But if a court regards, as it may, a publication concerning a matter of law pending before it, as tending toward such an interference, it may punish it as in the instance put. When a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by premature statement, argument or intimidation hardly can be denied. *Ex parte Terry,* 128 U. S. 289; *Telegram Newspaper Co.* v. *Commonwealth,* 172 Massachusetts, 294; *State* v. *Hart,* 24 W. Va. 416; *Myers* v. *State,* 46 Ohio St. 473, 491; *Hunt* v. *Clarke,* 58 L. J. Q. B. 490, 492; *Rex* v. *Parke* [1903], 2 K. B. 432. It is objected that the judges were sitting in their own case. But the grounds upon which contempts are punished are impersonal. *United States* v. *Shipp,* 203 U. S. 563, 574. No doubt judges naturally would be slower to punish when the contempt carried with it a personally dishonoring charge, but a man cannot expect to secure immunity from punishment by the proper tribunal, by adding to illegal conduct a personal attack. It only remains to add that the plaintiff in error had his day in court and opportunity to be heard. We have scrutinized the case, but cannot say that it shows an infraction of rights under the Constitution of the United States, or discloses more than the formal appeal to that instrument in the answer to found the jurisdiction of this court.

*Writ of error dismissed.*

MR. JUSTICE HARLAN, dissenting.

I cannot agree that this writ of error should be dismissed.

By the First Amendment of the Constitution of the United States, it is provided that "Congress shall make no law respecting an establishment of religion, or abridging the freedom of speech, or of the press, or of the right of the people peaceably to assemble and to petition the Government for redress." In the *Civil Rights cases,* 109 U. S. 1, 20, it was adjudged that

the Thirteenth Amendment, although in form prohibitory, had a reflex character in that it established and decreed universal civil and political freedom throughout the United States. In *United States* v. *Cruikshank,* 92 U. S. 542, 552, we held that the right of the people peaceably to assemble and to petition the Government for a redress of grievances—one of the rights recognized in and protected by the First Amendment against hostile legislation by Congress—was an attribute of "national citizenship." So the First Amendment, although in form prohibitory, is to be regarded as having a reflex character and as affirmatively recognizing freedom of speech and freedom of the press as rights belonging to citizens of the United States; that is, those rights are to be deemed attributes of national citizenship or citizenship of the United States. No one, I take it, will hesitate to say that a judgment of a Federal court, prior to the adoption of the Fourteenth Amendment, impairing or abridging freedom of speech or of the press, would have been in violation of the rights of "citizens of the United States" as guaranteed by the First Amendment; this, for the reason that the rights of free speech and a free press were, as already said, attributes of national citizenship before the Fourteenth Amendment was made a part of the Constitution.

Now, the Fourteenth Amendment declares, in express words, that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." As the First Amendment guaranteed the rights of free speech and of a free press against hostile action by the United States, it would seem clear that when the Fourteenth Amendment prohibited the States from impairing or abridging the privileges of citizens of the United States it necessarily prohibited the States from impairing or abridging the constitutional rights of such citizens to free speech and a free press. But the court announces that it leaves undecided the specific question whether there is to be found in the Fourteenth Amendment a prohibition as to the rights of free

speech and a free press similar to that in the First. It yet proceeds to say that the main purpose of such constitutional provisions was to prevent all such *"previous* restraints" upon publications as had been practiced by other governments, but not to prevent the subsequent punishment of such as may be deemed contrary to the public welfare. I cannot assent to that view, if it be meant that the legislature may impair or abridge the rights of a free press and of free speech whenever it thinks that the public welfare requires that to be done. The public welfare cannot override constitutional privileges, and if the rights of free speech and of a free press are, in their essence, attributes of national citizenship, as I think they are, then neither Congress nor any State since the adoption of the Fourteenth Amendment can, by legislative enactments or by judicial action, impair or abridge them. In my judgment the action of the court below was in violation of the rights of free speech and a free press as guaranteed by the Constitution.

I go further and hold that the privileges of free speech and of a free press, belonging to every citizen of the United States, constitute essential parts of every man's liberty, and are protected against violation by that clause of the Fourteenth Amendment forbidding a State to deprive any person of his liberty without due process of law. It is, I think, impossible to conceive of liberty, as secured by the Constitution against hostile action, whether by the Nation or by the States, which does not embrace the right to enjoy free speech and the right to have a free press.

MR. JUSTICE BREWER, separately dissenting.

While not concurring in the views expressed by Mr. Justice Harlan, I also dissent from the opinion and judgment of the court. The plaintiff in error made a distinct claim that he was denied that which he asserted to be a right guaranteed by the Federal Constitution. His claim cannot be regarded as a frivolous one, nor can the proceedings for contempt be

entirely disassociated from the general proceedings of the case in which the contempt is charged to have been committed. I think, therefore, that this court has jurisdiction and ought to inquire and determine the alleged rights of the plaintiff in error. As, however, the court decides that it does not have jurisdiction, and has dismissed the writ of error, it would not be fit for me to express any opinion on the merits of the case.