**UNITED STATES of America, Appellee,**

**v.**

**Pasquale PERROTTA, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

**v.**

**William AGNOS, Defendant, Appellant.**

**Nos. 76–1190, 76–1191.**

United States Court of Appeals, First Circuit.

Argued Jan. 6, 1977.

Decided April 25, 1977.

Stephen W. Silverman, Springfield, Mass. by appointment of the court, for Pasquale Perrotta, defendant, appellant.

Michael O. Jennings, Springfield, Mass. by appointment of the court, for William Agnos, defendant, appellant.

George F. Kelly, U. S. Dept. of Justice, Washington, D.C., with whom James N. Gabriel, U. S. Atty., Boston, Mass., Gerald E. McDowell, U. S. Dept. of Justice, Washington, D.C., were on brief, for appellee.

Before COFFIN, Chief Judge, and CAMPBELL, Circuit Judge, and BOWNES, District Judge.*

LEVIN H. CAMPBELL, Circuit Judge.

█ Both appellants, Pasquale Perrotta and William Agnos, were convicted, after a jury trial, of conducting an illegal gambling business in violation of 18 U.S.C. § 1955. They raise the following issues on appeal: (1) The legality of the wiretaps from which the Government obtained crucial evidence against them; and (2) The possibility of prejudice as a result of potential exposure of jurors to publicity concerning evidence which the judge had suppressed.[1]

The first issue is now effectively foreclosed by our decision in *United States v. Scibelli,* 549 F.2d 222 (1st Cir., 1977), *petition for cert. filed,* 45 U.S.L.W. 3619 (Mar. 7, 1977), decided after oral argument in this case, upholding the legality under 18 U.S.C. § 2518 of the same series of wiretaps as are at issue here. We accordingly reject appellants' arguments on that score.

The second issue is considerably more troublesome, and leads us to reverse and remand for a new trial. Appellants assert that they were not assured of a fair trial because the judge did not take steps to discover whether prejudicial information featured prominently during the trial in a local newspaper had reached any of the jurors and affected their ability to render an unbiased verdict.

On March 1, 1976 trial of the two appellants (and of a third person, since deceased) began in the federal district court in Springfield, Massachusetts. On March 5 the Government sought to introduce as part of its case in chief approximately $163,000 in currency which had been seized from the premises of the now deceased codefendant. Upon objection by counsel for each of the defendants and after a good deal of spirited argument outside the presence of the jury, the court refused to admit the money as evidence and stated:

"I don't think there is any question in my mind but that the . . . cash . . . is relevant, but . . . to allow that much cash to be found without any other information pertaining to a gambling syndicate or gambling operation of any kind . . . would clinch a conviction on the spot, and it seems to me that the probative value it would surely have is outweighed by the unfair prejudice to the [now deceased co-defendant] as well as the other two defendants on trial who are not connected to this cash or the search . . . . .[2]

"[T]he $163,000 that was found in the house remains unconnected without addi-

---

\* Of the District of New Hampshire, sitting by designation.

1. Appellant Perrotta also challenges the sufficiency of the evidence against him, contending that it is not probative of a violation of 18 U.S.C. § 1955. We think the Government introduced enough evidence from which a jury could reasonably infer that Perrotta's conduct had violated the statute. *See United States v. Harris,* 460 F.2d 1041, 1049–50 (5th Cir.), *cert. denied,* 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130 (1972). *See also id.* at 1051 n.1 (on petition for rehearing).

2. *See* Fed.R.Ev. 403:
   "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."
   We express no view as to whether or not the court should have admitted evidence of the $163,000 against the third defendant. Plainly, however, it was not material to the Government's case against appellants, who would have been entitled to jury instructions to that effect.

tional proof on the premises as to a gambler, operation [and] becomes extremely prejudicial not only as to this defendant but the other defendants.

"I am going to rule that the money will not be admissible in this case. You may bring the jury in."

That evening's edition of the *Springfield Daily News,* the city's only evening newspaper, carried the following headline on page one: "JUDGE BARS RAID CASH AS GAMBLING EVIDENCE." The headline introduced an article which related the essence of the judge's ruling as to the admissibility of the money. The article mentioned the present appellants by name, and—significantly—it noted that the judge had said that "the money, on its own, would be 'extremely prejudicial' to [the now deceased codefendant's] case and that of the other two men as well."

When the trial resumed on March 8, counsel brought the newspaper article to the judge's attention and requested that he "poll the jury as to whether they have seen anything in the news media." The judge declined, however, saying that he had previously told the jury "to ignore anything they see in the press" and that he would give them a similar instruction in his final charge. (We assume that he did so, although we have no record of the charge.) The case went to the jury shortly thereafter, which found all defendants guilty.

Although we have previously dealt with the problem of prejudicial publicity in related contexts, *see, e. g. United States v. Coast of Maine Lobster Co.,* 538 F.2d 899 (1976); *United States v. Concepcion Cueto,* 515 F.2d 160 (1975); *United States v. Williams,* 496 F.2d 378 (1974); *Patriarca v. United States,* 402 F.2d 314 (1968), *cert. denied,* 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969); *Delaney v. United States,* 199 F.2d 107 (1st

Cir. 1952), we have never had occasion to emphasize precisely the procedures which should be followed when the district court, in the course of a trial before a non-sequestered jury, receives reliable information that potentially prejudicial publicity has been disseminated through one or another of the mass media under circumstances making it likely that the information has reached one or more of the jurors.[3]

█ Where the problem has arisen elsewhere, most of the affected circuits have held that the judge is required immediately to conduct some form of examination of the jurors to determine whether or not they have encountered the information —assuming, of course, the court is first satisfied that the information is genuinely prejudicial. *See, e. g., United States v. Pomponio,* 517 F.2d 460, 463 (4th Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975); *United States v. Hankish,* 502 F.2d 71, 76–78 (4th Cir. 1974); *United States v. Thomas,* 463 F.2d 1061 (7th Cir. 1972); *Margoles v. United States,* 407 F.2d 727, 735 (7th Cir.), *cert. denied,* 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969); *United States v. Schrimsher,* 493 F.2d 848, 854 (5th Cir. 1974); *Mares v. United States,* 383 F.2d 805, 808 (10th Cir. 1967). *Cf. United States v. Vento,* 533 F.2d 838, 869 & n.106 (3d Cir. 1976). Such an inquiry is in keeping with Justice Holmes' observation that, "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907),[4] *quoted in Sheppard v. Maxwell,* 384 U.S. 333, 351, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Like our sister circuits, we believe that when potentially prejudicial publicity

---

**3.** *But cf. United States v. Concepcion Cueto,* 515 F.2d 160 (1975). In *Concepcion Cueto,* dealing with publicity during a criminal trial which "went beyond anything we [felt] able to assume the average juror could withstand," *id.* at 164, we noted that the trial judge had "proceeded to interview the jurors individually in his chambers, as recommended in *Patriarca v.*

*United States,* 402 F.2d 314, 318 (1st Cir. 1968), cert. denied, 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969)." *Id.* at 163.

**4.** *See also United States v. Burr,* 25 F.Cas. 49 (No. 14,692g) (C.C.D.Va.1807) (Marshall, C. J. sitting as circuit judge) (dealing with inflammatory newspaper articles against Aaron Burr).

has occurred to which jurors may have been exposed, and this fact is timely called to the court's attention, it must promptly take steps to ascertain "that the conclusions to be reached . . . will be induced only by evidence and argument in open court." We approve, as a general rule of practice to be observed in this circuit,[5] the following formulation by the seventh circuit in *Margoles v. United States, supra:*

> "[W]here prejudicial publicity is brought to the court's attention during a trial . . . the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further." *Id.* at 735.

*See also United States v. Hankish, supra* at 77. While much discretion in dealing with incidents of this nature is vested in the trial judge,[6] *see United States v. Jones,* 542 F.2d 186, 194 & n.9 (4th Cir. 1976), we agree with the *Margoles* court that once the court has actually determined that one or more of the jurors has been exposed to prejudicial publicity, its further investigation of the matter should be conducted on an individualized basis so that jurors will be encouraged to speak freely and will not repeat prejudicial information in one another's presence.

Inquiry of any sort need be undertaken only in those instances where the district court finds that publicity which has been brought to his attention is in fact prejudicial.[7] *See United States v. Hankish, supra* at 77 (citing cases). We shall accord considerable although, of course, not unlimited respect to the court's finding in this regard. *See United States v. Jones, supra* at 194–95. *See also Marshall v. United States,* 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

■ In the instant case the newspaper article that was prominently featured in the *Springfield Daily News* reported the district court as having characterized the suppressed evidence concerning the $163,000 as "extremely prejudicial" to the case of the appellants. The judge's opinion in this regard might well have been understood to mean that the evidence was probative of appellants' guilt. The total effect of the article could have been to suggest that serious evidence pointing to the guilt of all three defendants had been found. In this respect, the article was more dangerous than disclosure of the same evidence in open court. Had the latter occurred, the jury would have been told, in the arguments of counsel and the court's instructions, that the $163,000 related only to the case against the third defendant.[8]

---

**5.** We specifically refrain from making any statement concerning what practices the Constitution might mandate in state criminal trials. *But see United States ex rel. Greene v. State of New Jersey,* 519 F.2d 1356 (3d Cir. 1975).

**6.** We leave to the sound discretion of the district court whether its initial inquiry into exposure to pre-trial publicity should be to the jurors collectively, as permitted in *Margoles v. United States,* 407 F.2d 727, 735 (7th Cir.), *cert. denied,* 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969), or individually. We decline to adopt a hard-and-fast rule that the *initial* inquiry must be conducted on an individual basis. Nonetheless, there will undoubtedly be situations where individual inquiry will be the preferred course from the outset, just as in less sensitive situations collective inquiry will be more economical of time and less distracting.

**7.** The cases distinguish between publicity which reports fairly accurately on what took place in court before the jury and publicity which deals with matters not brought to the jury's attention in open court. *Compare Martin v. United States,* 528 F.2d 1157, 1158 (4th Cir. 1975); *United States v. Calvert,* 523 F.2d 895, 902 (8th Cir. 1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976) *with Silverthone v. United States,* 400 F.2d 627 (9th Cir. 1968). *See also Marshall v. United States,* 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); *United States v. Jones,* 542 F.2d 186, 195 & n.12 (4th Cir. 1976).

**8.** Evidence brought to the jury's attention extrajudicially is not subject to those procedural controls which are an intrinsic part of our system. *See Marshall v. United States, supra* at 312–13, 79 S.Ct. 1171; *Patterson v. Colorado,*

We conclude that the article's potential for prejudice to the appellants was such as to require the district court to have conducted some form of inquiry of the jury as soon as the publicity was brought to its attention in order to determine whether any juror had seen the article. As this was not done, we must consider whether the court's error was harmless. We think not. To be sure the jurors had wisely been instructed not to read anything about the case in the newspapers. We may assume that many of them took that instruction to heart. In cases where the publicity is more clearly innocuous or is less likely to have been noticed by jurors, such an instruction may well save the day. But the court itself said, "It is pretty hard for me to find that they have not seen it," and it is a fact that the article was prominently displayed and would have been hard for even a conscientious juror to overlook. The very purpose of an inquiry would have been to ascertain precisely whether any juror had read the article, and we believe that appellants were entitled to the reassurance of such an inquiry. Where inquiry is seasonably requested,[9] we will not when dealing with publicity of this prominence simply presume that no one of the jurors read the offensive material.

Since there was no inquiry, we can only speculate as to what effect—if any—the publicity could have had on the jury's decision. While the jury well may have reached the same decision in any event, we "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). *Compare United States*

*v. Kallevig,* 534 F.2d 411, 415 (1st Cir. 1976). *Cf. United States v. Thomas, supra* at 1065. We, therefore, reverse and remand for a new trial.

*So ordered.*

205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907). Here if the court had found upon inquiry that one or more jurors had seen the article, the situation would have lent itself to easy correction by means of effective instructions explaining that the $163,000 in currency was irrelevant to the case against appellants. *Cf. United States v. Concepcion Cueto,* 515 F.2d 160 (1st Cir. 1975) (curative instructions

inadequate given the extremely prejudicial nature of the publicity).

9. The considerations will, of course, be altogether different where inquiry of the jury is not seasonably requested. *See e. g., United States v. Beitscher,* 467 F.2d 269, 274 (10th Cir. 1972). *Cf. United States v. Thomas,* 463 F.2d 1061 (7th Cir. 1972).